UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DENNIS WASIEWSKI

                      Plaintiffs,           MEMORANDUM AND ORDER

      - against -                           03-CV-3356 (JMA)

GREAT LAKES DREDGE & DOCK COMPANY,

                      Defendant.
------------------------------------------------------------X
APPEARANCES:

    GREGORY R. LA MARCA, P.C.
    898 BROADWAY, SUITE 2
    MASSAPEQUA, NEW YORK 11758

    THOMAS E. STILES, ESQ.
    30 MAIN STREET – 7H
    BROOKLYN, NEW YORK 11201

**AZRACK, United States Magistrate Judge**:

Plaintiffs Dennis Wasiewski brought this action against the Great Lakes Dredge & Dock Company, pursuant to the Jones Act, 28 U.S.C.S §§ 1916, 1333 and 1337, claiming that his back was injured while working aboard the vessel Melvin Lemmerhirt ("Vessel") along the navigable waters of the Cape Fear River in North Carolina. Plaintiff alleges that his back injury was due to the negligence of defendant while plaintiff was assisting the crew of the vessel fight a fire in the vessel's engine room. The parties consented to have me preside over this case for all purposes including entry of judgment, pursuant to 28 U.S.C. § 636(c). Defendant admitted liability. Accordingly, I conducted a bench trial to

determine damages on November 15-16, 2004. Set forth below are my findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

**FINDINGS OF FACT**

The Accident

1. On July 11, 2000, plaintiff was employed by defendant as a seaman aboard defendant's vessel, the Melvin Lemmerhirt. The Vessel was navigating along the Cape Fear River in North Carolina when a fire broke out in the engine room on or about 11:00 pm on the night of July 10, 2000.

2. Upon direction of the Vessel's captain, the plaintiff and other members of the crew, attempted to extinguish the fire by carrying approximately 8-16 fire extinguishers down a flight of steel ladder steps into the engine room of the Vessel. The fire extinguishers weighed approximately 25-30 pounds each.

3. At or about 1:30 am, while assisting in fighting the fire, plaintiff slipped while descending the steel ladder steps into the engine room. Plaintiff fell down approximately 10 steps on his back and landed on the steel deck after hitting his back on the bottom step. At the time of the fall, the visibility of the engine room was minimal due to the smoke from the fire.

4. For several months prior to the fall, plaintiff worked as a deck hand for defendant, which required him to lift and carry equipment weighing between 20 and 250 pounds. At the time of the accident, plaintiff was 20 years old. According to both plaintiff and defense witness Rick Leitz, prior to

the fall, plaintiff is not known to have any documented claims for injuries to his back.

5.  Plaintiff continued to work for defendant until the Fall of 2001, during which time plaintiff testified that he received his Captain's license. Plaintiff left Great Lakes in the fall of 2001 and became employed at Brown Towing, and then became employed with Empire Harbor Marine as a Mate.

Wasiewski's Injuries: Medical Exams and Diagnostics

6.  Subsequent to the injury, plaintiff was evaluated and treated by five physicians, including two orthopedic surgeons. Additionally, plaintiff underwent an independent medical examination by Dr. Barry Gloger on November 15, 2004. Plaintiff also underwent multiple x-ray examinations and a magnetic resonance imaging ("MRI") of his lumbar spine region.

7.  Plaintiff received treatment for the injury on July 11, 2000, at or about 3:00 am at Dosher Memorial Hospital in Southport, North Carolina. The Dosher Memorial Hospital physical examination showed patient exhibited, "chest tightness...dizziness after inhaling fumes on tugboat" and back pain and tenderness due to the fall down the steel ladder steps. The Dosher Memorial Hospital record also states that plaintiff's skin is intact without discoloration, that plaintiff's back was tender in the lower thoracic and upper lumbar area. The record also shows that plaintiff stated that he was not tender over the kidneys nor over the sacroiliac joint. However, the report's final diagnosis of patient is a "back

sprain" and "smoke exposure."

8.      Plaintiff flew home on or about July 11 or 12, 2000.  Subsequently, on or about July 14, 2000 and July 28, 2000, plaintiff was examined by his personal physician Dr. Keith C. Apuzzo. During both exams, Dr. Apuzzo noted that patient exhibited tenderness and severe back pain.  Dr. Apuzzo recommended plaintiff see an orthopedic physician and plaintiff saw Dr. Dorothy Scarpinato.

9.      Plaintiff was then examined further by Dr. Dorothy Scarpinato on August 2, 2000.  Dr. Scarpinato is an orthopedist at Central Orthopedic Group in Plainview, New York.  Dr. Scarpinato observed that plaintiff exhibited "lumbar contusion and spasm" as a result of plaintiff's injuries.  While Dr. Scarpinato did note the existence of "tenderness to palpation in the lumbar region mid-line as well as the right paraspinal region," she also noted that plaintiff had a good range of motion without pain and that no ecchymosis (a collection of blood greater than 1 cm in size outside the vascular tree, and within the tissue) or swelling was noted.  An x-ray examination of plaintiff's lumbosacral spine revealed a slight straightening of the lordotic curve on the lateral view.  However, Dr. Scarpinato further observed "no acute abnormalities, fractures or subluxations [(problem areas of spine that affect nervous system)].

10.     On January 2, 2001, plaintiff was treated by a urologist, Dr. Bruce Gilbert.  Plaintiff noted to Dr. Gilbert that he had experienced "a sudden change in his urinary flow pattern" after falling down the steel ladder steps on July 11, 2001 and after experience loss of consciousness from falling into the

water from the ship two weeks prior to Dr. Gilbert's medical exam of plaintiff. Plaintiff specifically complained that he experienced "a decreased force of stream and the [feeling] of not being able to adequately empty his bladder." Dr. Gilbert also noted that plaintiff's past medical history "is significant for a speech impediment as child which was treated with 'spinal manipulation.'" Dr. Gilbert's final diagnosis was that patient be referred to Dr. Richard Blanck, a neurologist, "for further evaluation of what appears to be flaccid neurogenic bladder secondary to either injury of his lower back or head injury."

11. On April 8, 2002, plaintiff visited Dr. Scarpinato again. This time Dr. Scarpinato noted that plaintiff was still experiencing lower back pain for approximately 20 months, although the initial x-rays had been negative. She noted that plaintiff had been doing exercises at home and had been placed on anti-inflammatories after the initial visit. She also noted plaintiff continued to exhibit mild tenderness in the lumbar region, despite having a good range of motion, and that the x-rays showed some straightening of the lordotic curve on both the lateral and oblique views. However, she found no acute abnormalities or fractures of plaintiff's spine in the ex-rays. Also, Dr. Scarpinato recommended that plaintiff have an MRI. However, plaintiff never scheduled an MRI at that point.

12. On March 31, 2003, Plaintiff was examined by Dr. P. James Newman at Syracuse Orthopedic Specialists in Syracuse, New York. Plaintiff complained of pain in the lumbar spine. Dr. Newman noted that plaintiff reported being out of work for approximately six to seven months after the injury. Dr. Newman observed some swelling and tenderness about the iliolumbar ligament complex.

Dr. Newman also found that plaintiff had full trunk flexibility, albeit with some minor discomfort on forward trunk flexion. Dr. Newman also found plaintiff's reflexes and motor sensory skills intact; observations in line with plaintiff's previous medical exams by other physicians. However, Dr. Newman suspected that plaintiff's "mechanical back pain is due to the compensation-related injury when he fell down some stairs" and believes plaintiff would benefit "from a more aggressive supervised physical therapy program." Dr. Newman also noted that patient found it difficult to sit for prolonged periods of time and has significant lower back pain with repetitive lifting. Additionally, plaintiff told Dr. Newman that he has not really had any recurrences that have kept him out of work completely although plaintiff stated that he obtained a captain's license to get off the deck. Dr. Newman ultimately recommended physical therapy to plaintiff, however, plaintiff never made arrangements for physical therapy. Plaintiff testified that he never pursued physical therapy due to financial and scheduling concerns.

13.     On March 1, 2004, plaintiff was examined by Dr. Richard Zogby and Physician Assistant John Tenous. Dr. Zogby testified at trial as well. Dr. Zogby is a board certified Orthopedic Surgeon and licensed in New York State. Dr. Zogby received his medical degree from SUNY Health Science Center in Syracuse, New York and has published two articles on orthopedics. Dr. Zogby, in his patient report dated March 1, 2004, writes that patient complains of low back pain, radiating to tailbone and finds it difficult to bend or sit without increased tailbone pain. Zogby also writes, "[p]atient states 'feet are freezing cold after chopping wood for a couple of hours, ice skating. This is a recent thing- past 8-9 months.'" Dr. Zogby noted that palpation of plaintiff's lumbar area revealed moderate midline tenderness and paraspinal tenderness of L4 of the spine and the sacrum. Again, consistent with previous medical

exams, Dr. Zogby observed a normal range of motion and normal sensory skills, although he did find patient experienced some pain in the lower back with flexion. Dr. Zogby, consistent with previous medical exams, recommended plaintiff receive some form of formal physical therapy.

14. On April 1, 2004, patient underwent an MRI of his back in Brooklyn at the Professional Radiology Service. Patient underwent the MRI at the request of defendant. On April 3, 2004, Dr. Nadie Jean-Charles read plaintiff's MRI. Dr. Charles is a radiologist and testified at trial concerning her impression of the of the MRI. Dr. Charles's found in her assessment that patient exhibited a, "straightening of the lumbar curvature" and "mild degenerative arthritis of the facet joint at L4/L5 and L5/S1."

15. Dr. Zogby again saw plaintiff on April 30, 2004, after the MRI. Dr. Zogby continued to note midline tenderness and tenderness from the L4 vertebrae to the sacrum. At trial, Dr. Zogby stated that plaintiff suffered from discogenic syndrome, resulting from plaintiff's fall down the steel steps.

16. On November 16, 2004, at defendant's request, an independent medical examination was performed on plaintiff by Dr. Barry Gloger, an orthopedic surgeon. Dr. Gloger testified that he has a degree in engineering from MIT and graduated from Albert Einstein College of Medicine, where he did his general surgery training. Dr. Gloger also testified that he did orthopedics training at the Hospital for Joint Diseases, Orthopedic Institute in New York and spine training with Patrick O'Leary at Lenox Hill

in special surgery. Dr. Gloger testified that in his opinion plaintiff suffered from mechanical back pain and experienced tenderness around the L4/L5 vertebrae and tightness in the right sided paraspinal muscles upon right flexion. Dr. Gloger also observed that plaintiff felt stiff upon any lumbar motion and exhibited discomfort upon jumping up and down. Dr. Gloger testified that plaintiff definitely injured his back in the fall down the steps on the Vessel on July 11, 2000. However, Dr. Gloger also testified that based on his review of the Dosher medical report, he believed that "whatever trauma be experienced wasn't enough to cause bleeding in the skin, strain the back from whiplash or other things that have spasms." Further, Dr. Gloger testified that in his opinion he believes that plaintiff's injuries "represent the total number of life experiences [plaintiff has] had."

Expert Testimony

17.	Dr. Richard Zogby testified at trial that the basis for his medical opinion and diagnosis of plaintiff was based upon his review of the MRI films, plaintiff's medical history and his physical examination of plaintiff. Dr. Zogby generally observed that plaintiff experienced lower back pain and discomfort during right and left flexion, which he testified to as indicative of pain.

18.	Dr. Richard Zogby testified at trial that due to the injury, plaintiff suffered from discogenic pain of the lumbar spine between the L5/S1 vertebrae. Specifically, Dr. Zogby referenced the x-rays films as evidence of plaintiff's injury. He noted that the films showed a narrowing in height of the disc between the L5/S1 vertebrae and that in his opinion he observed a partial tear of tissues and disc dessication in plaintiff's MRI. Zogby testified that the height of this disc should be at least equal to, if

not larger, than the height of the space between the surrounding vertebrae. Zogby further testified to the presence of a tear or sprain of the disc evidenced by flattening of the curvature of the lumbar spine, which could cause chronic muscle spasm.

19. Dr. Zogby also corroborated Dr. Charles's reading of the MRI films and Dr. Scarpinato's reading of plaintiff's x-rays in August 2000 and April 2002, by noting that the films showed a straightening of the lordotic curvature in the lower spine. Zogby further testified that inflammation of the disc may increase and decrease alternatively depending on the intensity and type of activity a person encounters or endures. As a result, lumbar spasms are not constant and there may be occasions where an x-ray or MRI film shows normal curvature of the spine, instead of a straightening of the spine. Defendant argues that this is the reason why the x-rays performed at Syracuse Orthopedic Specialists in March 2003 and March 2004 showed no straightening of the spine.

20. Finally, Dr. Zogby testified that based upon his examination of plaintiff and his experience with treating spinal problems generally and similar spinal problems, it was likely that the fall down the steel steps was a "competent producing cause of the disc injury" suffered by plaintiff. Additionally, Dr. Zogby testified that he lacked any information, other than the history provided by plaintiff including a history of playing aggressive sports, which would suggest any other cause would be the cause of plaintiff's injury other than the fall down the steel steps. Dr. Zogby also testified that his diagnosis was predicated upon plaintiff injuring himself while making a twisting motion, which defendant finds consistent "with the fact that [plaintiff] released a fire extinguisher he was carrying with his left hand while

holding the railing of the stairs with his right when he slipped and fell down the stairs." However, Dr. Zogby also testified that his assessment that the injury was the result of the fall was based solely on "nothing other than the history that plaintiff presented."

21. Finally, Dr. Zogby testified that in his opinion, the injury would be permanent and that due to the injury, plaintiff could experience pain due to chronic inflammation of the disc caused by poor blood supply and circulation to the disc.

22. Dr. Charles testified to her impression of the MRI films. Dr. Charles is a radiology specialist with a sub-speciality in body imaging of the neck and chest. Dr. Charles testified that lordotic straightening of the lumbar spine is caused by muscle spasm. Regarding the absence of the straightening in two previous x-rays, Dr. Charles stated that the x-rays have no effect on her opinion on the reading of the MRI film.

23. Dr. Charles also noted mild degenerative arthritis of the fascia joints at the L4/L5 and L5/L1 vertebrae and testified that this type of finding is not normal for a young adult male as the plaintiff. Dr. Charles testified that the cause of the degenerative arthritis could be due either to repetitive micro trauma or a specific trauma but that there was really no way to tell "whether the mild degenerative arthritis [seen] on the MRI is a result of trauma" or not. Plaintiff's counsel argues that Dr. Charles' "diagnosis comports with [p]laintiff's complaints of pain when performing repetitive physical lifting and bending, as well as prolonged sitting, as noted by Dr. Newman in March, 2003."

24. Finally Dr. Charles acknowledged that the x-rays taken by Dr. Scarpinato in August 2000 and April 2001 also showed straightening of the lordotic curvature of the spine and that the straightening could be either positional or due to the way the person is naturally built. Further Dr. Charles testified that the "straightening of the lordotic curve occurs in spasms, but the source of the spasms can be a variety of things...?" However, Dr. Charles also disagreed with Dr. Zogby's reading of the MRIs and stated that in her opinion the MRIs did not show any narrowing between the L5-S1 vertebrae. Dr. Charles also testified that she did not see any discogenic disease in the MRI.

25. Dr. Gloger testified that plaintiff told him during his examination of plaintiff that "whenever he would do any manual labor, such as bending, lifting, carrying, scrubbing a floor on his hands and knees....his back would become painful after about five minutes and he would be laid up for two days from the pain...." Additionally, plaintiff told Dr. Gloger that the "episodes of difficulty urinating had resolved after about eight months from the injury, that his genital function was normal, his bowels were normal and that at the present time he was working as a tugboat pilot and that he was not receiving any physical therapy or chiropractic therapy and that when symptomatic he would take over-the-counter medications such as Tylenol and Advil."

26. Dr. Barry Gloger, defendant's expert, testified that he believed the cause of plaintiff's injury was due to the fall down the steel steps. Dr. Gloger testified that the x-rays he took of plaintiff on November 15, 2004 showed a little flattening of the spine, normal disc spacing and a little list to the left side. Dr. Gloger testified that he considered these observations to be "hardly abnormalities." He further

testified that the reason for the list to the left side could be positional or due to "imbalance in the muscle tension, reflecting pain or spasm or scar tissue or contractions." However, based upon his physical examination of plaintiff, Dr. Gloger testified that while he believed plaintiff did have some muscle tenderness between the L4-L5 vertebrae, he did not believe his muscles were spasming.

27. Dr. Gloger also testified that during his examination of plaintiff immediately prior to the commencement of trial on November 15, 2004, he observed plaintiff to exhibit stiff and guarded lumbar motion. He also observed that plaintiff demonstrated discomfort when jumping up and down and stiffness in plaintiff's spine when bending forward. Dr. Gloger also noted palpable tenderness on the L4/L5 vertebrae and tightness on both the right and left sided paraspinal muscles when plaintiff bent forward.

28. Based solely upon plaintiff's fall down the steel steps and plaintiff's prior x-rays and MRI scans and Dr. Gloger's personal observations and examinations, Dr. Gloger diagnosed plaintiff as suffering from mechanical back pain. However, Dr. Gloger in making his assessment did not consider patient's history of prior physical activities, which Dr. Gloger feels would have been important in formulating a more complete diagnosis; even though plaintiff's counsel claims Dr. Gloger had ample opportunity during the exam to question plaintiff about his previous activities.

29. Dr. Gloger also testified that he found no tearing or the presence of arthritis on the MRI films. He also testified that subtle distinctions in the MRI can be found and can possibly result from soft

tissue shadows of an MRI film and thus two orthopedists reviewing the same film may arrive at different assessments of the MRI films.

30. Dr. Gloger's ultimately testified that plaintiff "has mechanical back pain", that "it appears [] that [plaintiff's] problems are in the muscles themselves" and that the muscles "are tight, there is scar tissue within the muscles, they don't function normally, they don't stretch normally, they don't contract normally and thus [plaintiff] can't bend normally."

31. Dr. Gloger also testified that is was highly unlikely given his pathology at this time and based upon his observations of plaintiff and review of plaintiff's medical records and x-rays, that plaintiff would need disc replacement surgery. However, this assessment is based upon plaintiff's current pathology.

32. Rick Lietz, defendant's claims manager, also testified that the medical documentation by Dr. Gilbert supported a finding that plaintiff's urinary dysfunction was related to the fall down the steps.

**CONCLUSIONS OF LAW**

33. Defendant admitting liability for causing plaintiff to fall down the metal steps on July 11, 2000. Thus, the only issue had hand is whether the fall was the proximate cause of plaintiff's injury and what

are the appropriate damages if defendant is found to be the proximate cause of plaintiff's injury.

34.     This Court has diversity jurisdiction over the parties and over this cause of action. As such, the law of New York State is applicable. *Erie Railroad v. Tompkins*, 204 U.S. 64 (1938).

35.     Under New York law, a defendant's conduct is found to be the proximate cause of plaintiff's injury if it a substantial factor in causing the injury. *Derdiarian v. Felix Contracting Corp.*, 51 N.Y. 2d 308 (1980).

36.     Where only one conclusion can be drawn from the established facts, proximate cause may be determined as a matter of law. *Derdiarian v. Felix Contracting*, 51 N.Y.2d at 315.

37.     The burden of proof is upon the party claiming the damage to prove that he has suffered damages and prove the elements thereof with reasonable certainty. *Calcagni v. Hudson Waterways Corp.*, 603 F.2d 1040 (2d Cir. 1979). Here, as stated before, the plaintiff must prove that defendant's breach proximately caused plaintiff's injury.

38.     Plaintiff also has the burden of proving loss of future income. *Boudreau v. S/V/ Shere Khan*, 27 F. Supp. 2d 72 (D. Me. 1998).

39.     Any amount awarded for pain and suffering depends on the Court's observations of plaintiff and its subjective determination of the amount needed to achieve full compensation. *Hyde v.*

*Chevron Inc.*, 697 F.2d 614, 635 (5th Cir. 1983).

## REQUEST AND AWARD FOR DAMAGES

40.     Plaintiff requests he be awarded a total of $1,314,385.00 in damages (Calculations are based on plaintiff's life expectancy being 51 years, based on Life Expectancy Tables published in the National Vital Statistics Report, Vol. 47, No. 28 (December 13, 1999) by the National Center for Health Statistics, Vital Statistics of the United States, Volume II, Mortality, Part A, Section 6).  Based upon the trial record and findings of fact, the Court holds that defendant's negligence on July 11, 2000 was the proximate cause of plaintiff's injuries and therefore awards plaintiff a total of $71, 760 in damages for the reasons discussed below.

## PAST LOST WAGES DAMAGES

41.     Based upon plaintiff's submission of actual lost time from work due to the incident of July 11, 2000, and plaintiff's pay scale at that time, the Court holds that plaintiff be awarded a total of $1,200 in lost wages.  Plaintiff normally worked two weeks on and two weeks off at a pay rate of approximately $191 a day.  Plaintiff did not work from July 13, 2000 to the early part of the week of August 13, 2000.  Therefore, plaintiff's lost wages for the time would have been approximately $2,674 before taxes and approximately $2,000 after taxes.  However, plaintiff was advanced $800 at the time and thus plaintiff's total lost wages owed amounts to $1,200.  There is no proof to show that plaintiff lost any additional wages from defendant due to the incident of July 11, 2000.

## SPECIAL DAMAGES

42. Plaintiff testified that at some point he chose to train as a Captain and move away from deck related duties due to continued physical problems, as a result of the July 11, 2000 incident, caused by the physically demanding duties of a seamen. Plaintiff incurred expenses in becoming trained and licensed as a Captain and would not have incurred these expenses were it not for the July 11 incident. Plaintiff spent approximately $2000 including: (1) $590 for the Master 100 ton course; (2) $495 for the Operator of Uninspected Passenger Vessel court; (3) $195 for a coast guard evaluation; (4) $500 for radar endorsement; and (5) $250 for books. Therefore, plaintiff should be awarded a total of $2000 in special damages.

## PAST UNPAID MEDICAL EXPENSES

43. The majority of plaintiff's medical expenses have been paid. However, the only unpaid medical bill is that of Dr. Bruce Gilbert in the amount of $560. Defendant's claims manager, Mr. Lietz testified that Dr. Gilbert's bill was not paid because he it was not clear to him whether or not the urinary tract problem was the result of the July 11th incident. However, the record seems to imply that plaintiff had health insurance at the time. Regardless, the Court finds no practical reason based on the facts at hand why plaintiff should not be compensated for Dr. Gilbert's medical bill. Thus, defendant owes plaintiff $560 in unpaid medical expenses.

**FUTURE MEDICAL EXPENSES**

44.     Plaintiff alleges a total of $393,225.00 in future medical expenses:

      (1) Ongoing Medical care, including office visits, physical therapy and anti-inflammatory medication: $306,000.00: $500.00/month x 12 months at 51 years

      (2) Disc Implant Surgery

          (a) Cost of Surgery: $60,000.00

          (b) Estimated Lost Wages for 4.5 months (Dr. Zogby estimates recovery time away from work between 3-6 months, assuming an annual salary of $72,000.000 a year if had surgery in two years, where current salary is $60,000.00 and assuming an annual increase of salary of 10% would be $27,225.00.

The record does not sufficiently persuade this Court that plaintiff will require disc implant surgery. What the numerous medical records and expert testimony does show is that plaintiff would benefit greatly from some form of physical therapy. While it is also clear is that plaintiff has thus far ignored the numerous doctor's recommendations for physical therapy, plaintiff did testify that he did so due to financial and scheduling concerns. Thus, while I find that plaintiff would benefit from physical therapy, his need for such is not dire and I do not think plaintiff requires lifelong physical therapy. Additionally, the plaintiff is a young man and has the capacity to improve his situation more rapidly than not with proper and consistent physical therapy. Absent any findings to prove otherwise, the Court awards plaintiff $18,000 in future medical expenses, not including disc implant surgery.

## PAST PAIN AND SUFFERING

45.     As a result of plaintiff's fall on July 11, 2000, the Court finds that plaintiff has endured past pain and suffering.  Specifically, plaintiff has difficulty performing the same types of rigorous activity, as lifting and carrying, that he performed occupationally or recreationally subsequent to the fall.  The trial testimony shows that plaintiff does continue to experience some lower back pain and tightening of the muscles in the lower back region upon turning or twisting.  Further, as a result of the fall on July 11th, plaintiff was ultimately led to forgo work as a seamen and pursue a Captain's license in order to avoid the type of physically demanding work he was accustomed to performing.  Additionally, plaintiff has been subjected to numerous medical visits and tests as a result of the July 11, 2000.  Therefore, the Court awards plaintiff a total of $20,000 in past pain and suffering.

## FUTURE PAIN AND SUFFERING

46.     The Court awards plaintiff $30,000 in future pain and suffering.  The record clearly indicates that plaintiff is capable of living a relatively fulfilling life.  While plaintiff may not be able to participate fully in full-contact sports as football and ice hockey, plaintiff appears to be able to function normally in other normal daily activities necessary to living a full lifestyle.          Plaintiff also continues to be employed and appears to have no problems with finding employment subsequent to the July 11, 2000 fall.  Additionally, while there has been some conflicting testimony of whether or not plaintiff's x-rays show a narrowing between the L5-S1 vertebrae, the testimony consistently indicates some straightening of the spine.  Finally, the Court believes that with continued physical therapy, as

recommended by plaintiff's various physicians, plaintiff will experience very little future pain and suffering, if any at all.

## ORDER FOR ENTRY OF JUDGMENT

For the reasons set forth above, it is hereby ordered that Judgment be entered in favor of plaintiff, Dennis Wasiewski.

SO ORDERED.

Dated: Brooklyn, New York
      April 28, 2005

                                              _____/S/_____
                                              JOAN M. AZRACK
                                              UNITED STATES MAGISTRATE JUDGE